226 N.J. Super. 182 (1988)
543 A.2d 1010
ESTATE OF FERDINAND HAGEL, PETITIONER-APPELLANT,
v.
BOARD OF TRUSTEES, PUBLIC EMPLOYEES' RETIREMENT SYSTEM, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted May 9, 1988.
Supplemental Briefs Filed June 9, 1988.
Decided June 30, 1988.
*183 Before Judges DREIER and BAIME.
Falvo, Bonello, Moriarty & Steiger, attorneys (John W. Wopat, III, of counsel and on the brief).
W. Cary Edwards, Attorney General of New Jersey, attorney (Michael R. Clancy, Deputy Attorney General, of counsel; Patrice M. Connell, Deputy Attorney General, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Petitioner, the Estate of Ferdinand Hagel, appeals from a determination of the Public Employees' Retirement System (P.E.R.S.) denying death benefits under N.J.S.A. 43:15A-41 and *184 57. Decedent had served as a part-time adjunct professor of mathematics at Brookdale Community College. Brookdale's academic year was divided into four terms, two long and two short. The two longer terms, fall (September-December) and winter (January-mid-May) were the regular school terms. Spring (mid-May-June) and summer (July-August) were the short terms held during the usual summer vacation period. No adjunct professors were retained for the spring short term, since sufficient regular professors were available at that time. Decedent taught a class at the college in each of the following terms: fall 1983, winter 1984, summer 1984, fall 1984, winter 1985, summer 1985, fall 1985 and winter 1986. At the end of the 1984-1985 regular academic year he was required to join the P.E.R.S. and did so. This membership continued through the date of his death.
In May 1986, at the end of the winter 1986 term, the mathematics team leader, Professor Schmid, recommended decedent to continue to teach courses in the summer 1986 term to be conducted during July and August. In mid-June, however, decedent telephoned Professor Schmid to inform him that he was ill and unable to teach the summer course. As found by the administrative law judge, "Professor Schmid told decedent that he hoped he would make a speedy recovery and that he (Schmid) would hold open the fall courses for decedent in anticipation of decedent's return to active teaching." Although this finding is supported by the record, the State Board noted merely that "Schmid told Hagel he would keep him in mind for the Fall 1986 term."
While the decision to hire faculty is vested in the Board of Trustees of the college, the administrative law judge determined that the practice had been for the Board to accept "the hiring recommendation of the heads of the various departments." The judge noted specifically that decedent had been hired on Professor Schmid's recommendation, that decedent was very reliable and had routinely been appointed and reappointed, and that Schmid had no doubt that but for decedent's *185 illness and death, decedent would still be teaching at the college. The State Board, however, stated that the official
approval process was repeated each semester for all adjunct faculty members and all approvals were subject to sufficient enrollment to justify offering the course the adjunct was approved to teach.... At no time was Hagel guaranteed a class to teach.
There is no basis in the record to find that continued employment was as problematic as found by the State Board. Professor Schmid's testimony permits no other conclusion but that the job was available to decedent if his health permitted him to teach.
Hagel died August 10, 1986, and upon plaintiff's application for death benefits, defendant denied the benefits pursuant to N.J.S.A. 43:15A-108a. That statute reads:
For the purpose of sections [N.J.S.A. 43:15A-41c, 49e and 57], a member of the Public Employees' Retirement System shall be deemed to be an active member ... (2) for a period of no more than 2 years while on official leave of absence without pay if satisfactory evidence is presented to the retirement system that such leave of absence without pay is due to the member's personal illness....
Under the referenced sections, death benefits are payable only to active members. Rogers v. State, 125 N.J. Super. 516 (App. Div.), aff'd o.b. 64 N.J. 40 (1973).
The administrative law judge correctly determined that petitioner was not on "official leave," since this leave was granted only to full-time staff of the college. He found, however, that petitioner had been given a de facto leave of absence, and the death benefits were thus properly payable. The State Board declined to accept the judge's recommended decision.[1] The State Board determined that at the end of each *186 teaching assignment petitioner had no right to the next assignment unless a new contract had been tendered. The Board found that during any hiatus decedent could have protected his rights by exercising the death benefit conversion privilege by which private insurance could have been secured to cover the disputed benefits. See N.J.S.A. 43:15A-93.
We determine, however, that there are two separate bases under which petitioner should have been paid the death benefits. First, given the nature of his job and the short, regularly-occurring breaks between periods of reasonably expected continued employment, decedent was still an active member at the time of his death; and, second, decedent was still covered by the death benefits policy under its conversion terms.

I
The administrative law judge approached his analysis in the spirit of the benchmark case of Geller v. Dept. of Treasury, 53 N.J. 591 (1969). There the Supreme Court recognized that the pension laws were remedial social legislation to be "liberally construed and administered in favor of the persons intended to be benefited thereby." 53 N.J. at 598. The administrative law judge further properly noted the line of cases granting to the governing boards of the various pension systems discretion in appropriate circumstances to waive specific time limitations.
We perceive in the State Board's opinion, however, a measure of rigid interpretation unrelated to the practical reality of the case before it. Decedent had taught semester after semester for years, and was told by the professor who supervised his program that a course would be held open for him in the fall semester. The fact that decedent did not teach during the usual summer vacation period after teaching the semester before, coupled with the college's articulated expectation that *187 he would continue to teach in the fall, demonstrated that there was no real interruption of his "active service."
N.J.A.C. 17:2-3.11 provides:
A member employed on other than a 12-month contract year will continue to be insured during the summer vacation period provided a bona fide employee-employer relationship exists during this period.
Although the section is headed "Ten Month Members," it is usual in the college setting for the summer break to exceed two months, and the section speaks of "the summer vacation period." The section further requires a "bona fide employee-employer relationship" during the period. This cannot mean that the employee must continue to work or even that he must not obtain supplemental employment, since we can take notice that most teachers at all levels either take actual vacations or find outside summer employment. Under N.J.A.C. 17:2-3.11, an employee with a formal continuing contract clearly is insured during the summer months. But what of the teacher who has taught year after year without a contract, expects to continue in the fall, and has not elected to terminate his P.E.R.S. membership by withdrawing his contribution or otherwise evidencing any intent to end his service? Can there be a de facto (and bona fide) employee-employer relationship which continues over the summer months? We think so.
The State Board in its opinion found that such an interpretation of either continued active service, or of a de facto official leave, would subvert the purpose of the statute and give no meaning to the term "official leave." "Official leave" was available only to full-time employees and would protect such employees for up to a two-year period. The "leave" here was for a much shorter period and was conditioned upon the expectation of both decedent and the college that he would return after the summer break, albeit a longer (full summer) break than he had taken in the past. Yet it is certainly not unusual in a college setting for an instructor not to teach for more than the fall and winter terms. While we agree with the Board that *188 there was no "official leave," we see no problem under these facts with finding continued actual service.
We therefore determine that since decedent had been specifically notified in May at the end of the winter term that he had a reasonable expectation of teaching his usual courses in the fall term, the type of employment here being considered should continue to carry with it de facto "active service" insurance protection over the brief hiatus during the spring or spring and summer terms.[2] Such an interpretation does no violence to the principles of the statute, carries out the broad aims of the pension laws, and fills in a gap obviously not recognized when the statute was drafted.[3]

II
Notwithstanding the Board's contention that decedent could have protected his rights by exercising his death benefit conversion privilege, we conclude that, except upon an expected termination of employment, this conversion right provided little if any protection. The conversion privilege is intended generally to be exercised upon termination of employment. N.J.S.A. 43:15A-93 provides that if upon reemployment a privately purchased conversion policy is in effect, any death benefits are subject to proof of insurability. Therefore, even if petitioner *189 was forced to purchase a private annual or semiannual policy for the interim periods, he would have lost a portion of his noncontributory death benefits during the period of overlap.[4] This obviously cannot be what the Legislature intended. We therefore have examined the applicable statutes, and determined that (a) there must be adequate notice, not here present, of the conversion option, and (b) under the specific facts of this case, the conversion period had not expired as of decedent's death.

(a)
There was no showing that petitioner received notice each year during the brief period he did not teach that conversion to a private insurance plan was the only way he could continue to preserve his death benefits. For a man suffering from leukemia, we have no doubt that this coverage was important, and, had interim coverage been offered, there would have been some mention in the record concerning its having been rejected after proper notice. We see little benefit in offering a conversion option, if notice of this option was omitted.
The Board in its supplemental brief contends that the "blue booklet," supplied at the time of decedent's initial P.E.R.S. enrollment, gave adequate notice. We have reproduced the *190 sections of the booklet which the Board asserts provided this notice.
DEATH BENEFITS
Most members are covered for the noncontributory as well as the system's contributory plan. Possible exceptions involve certain optional enrollees and employees who enroll after the first year of compulsory membership or after attaining age 60; they must prove insurability before coverage is approved. If such member fails to report for a scheduled examination or if the medical examination does not establish insurability, the coverage is not extended. (See note below regarding insurability.)
In fact, during a member's first year (12 months) of membership in the system, such member normally will be required by statute to participate in the system's contributory plan. Thereafter, a member may cancel the contributory coverage by filing an appropriate notice of withdrawal form with the system in advance of the desired termination date. Once cancelled, however, it cannot be reinstated. The current contribution rate for this coverage is three-fourths of 1 percent of salary.
If your position permits you to enroll in the retirement system and you are less than 60 years of age, you will be covered by both noncontributory and contributory coverages without medical examination, if your application for enrollment in the system is filed within one year of your original eligibility for enrollment.
NOTE: If evidence of insurability is required, the retirement system will arrange for the necessary medical examination at no cost to you.
AMOUNTS OF DEATH BENEFITS  not applicable
CONDITIONS
A member's death benefit coverage will continue in full force for the following approved leaves of absence without pay:
a. up to two years while on official leave of absence for personal illness, including maternity (as this covers the member's personal illness, it does not include a leave for child care);
b. up to one year: (1) to fulfill a residency requirement for an advanced degree or (2) as a full-time student at an institution of higher education;
c. up to 93 days while on official leave for reasons other than personal illness.
No contributions for the contributory plan will be required from you to continue your contributory coverage during the periods of approved leave set forth in (a) above; contributions will be required to continue coverage for the periods detailed in (b) and (c).
A member who goes on leave of absence must be granted an official leave by the employer and such specific employer action shall be reported to the system. Members required to make contributions while on leave must arrange with the system within 31 days to make such payments for their contributory coverage for the periods indicated in (b) and (c) above.

*191 A member's death benefit coverage will continue for the time in which the member's claim for disability retirement benefits is being processed, provided the claim was filed within 30 days following the member's termination of active service; no charges are required for the contributory insurance.
Members still on leave after the expiration periods indicated above may wish to arrange with the insurance company to convert all or part of their coverage. This may be done without medical examination but must be done within 31 days following the end of the expiration period, or earlier, at the termination of the leave due to resignation or dismissal. This is known as `conversion.'
Conversion is also available within 31 days to members who resign, but not to those applying for retirement benefits.
Conversion should be considered by those who are ill and who are not likely to be able to obtain an individual life insurance policy by passing a medical examination. For those who can prove insurability and meet the insurance company's medical requirements, conversion may be unnecessary or unduly restrictive in benefits. (Conversion is possible only to a whole life policy with no disability provisions.)
NOTE: If a member returns to covered employment after conversion, such member must either cancel the private policy or prove insurability by medical examination to be covered again by the system's death benefits.

Death Benefit Coverage While Receiving Worker's Compensation  not applicable

Payment  not applicable

Accidental Death  not applicable
BENEFICIARY DESIGNATION  not applicable
SUPPLEMENTAL VARIABLE ANNUITY  not applicable
The conversion "condition" is stated to be applicable after the expiration of a leave of absence or after the termination of a leave of absence by resignation or dismissal. "Conversion is also available within 31 days to members who resign, but not to those applying for retirement benefits." There appears to be no mention that conversion insurance is even offered during a summer break to an employee who is hired for successive periods and expects to continue such service.
N.J.S.A. 17B:27-24 requires notice "at least 15 days prior to the expiration date" of the period within which the employee can convert to a private plan. Even if the "blue booklet" had contained an adequate description of what the Board contends were decedent's options, such notice would not have satisfied the Legislature's direction. Cf. Wells v. Wilbur B. Driver Co., 121 N.J. Super. 185, 196 (Law Div. 1972) (wherein *192 then Judge Handler determined that there must be notice at the time of termination or else there will be the additional 60 days of coverage provided by the statute). And cf. Keane v. Aetna Life Ins. Co., Hartford, Conn., 22 N.J. Super. 296, 309-310 (App.Div. 1952) (where the lack of notice was upheld only because N.J.S.A. 17:34-32.2, the predecessor to N.J.S.A. 17:B:27-24, was inapplicable). We reject the notion that the notice envisioned by the Legislature could be satisfied by giving a new employee a booklet of approximately 43 pages at the time of P.E.R.S. enrollment, often many years before the event.[5] If respondent chooses a different course of action, i.e., to give the omitted notice and require the private purchase of insurance during each brief period of inactivity, then this insurance must be made available at monthly, weekly or even daily rates, with adequate notice to each affected member. Cf. McKenna v. Prudential Ins. Co., 224 N.J. Super. 172, 180-181 (App.Div. 1988).

(b)
As noted in McKenna, N.J.S.A. 17B:27-24 (there applied to parallel sections of Title 18A) requires notice, omitted here, of conversion rights under group life insurance. Ibid. N.J.S.A. 43:15A-93 provides that "if a member dies during the 31-day period during which he would be entitled to exercise the conversion privilege," the claim should be paid under the group policy. See also N.J.S.A. 17B:27-21. The 31-day conversion period in N.J.S.A. 17B:27-19b is extended up to 60 days if notice has not been given. N.J.S.A. 17B:27-24. Since petitioner's last day of active service was May 15, 1986, the combined 31 and 60-day extended periods available to him if there had *193 been no notice of his conversion rights, did not expire until August 14, 1986. Petitioner died August 10, 1986. Therefore under N.J.S.A. 17B:27-21 he should have been considered as still covered by the group policy.
The decision of the Board of Trustees of the Public Employees' Retirement System is reversed and the matter is remanded to the Board for the payment of the appropriate death benefits to petitioner.
NOTES
[1] While the action of the State Board was timely, its reasons were given to petitioner well after the expiration of the 45-day period during which the State Board was required to act upon the judge's recommendations. Petitioner has argued that the decision of the State Board includes its reasons, and therefore the late filing of the reasons constituted an automatic approval of the administrative law judge's recommended decision. We disagree. But since we have in any event determined that the substantive determination of the State Board failed to afford decedent and petitioner their appropriate remedies, this issue is moot. See Belleville v. Coppla, 187 N.J. Super. 147, 152-153 (App.Div. 1982).
[2] Since decedent's contact at the College had informed decedent that the job was being held open for him in the fall term, the Board should not be heard to claim that decedent should have considered his continuing employment to be uncertain. There was no reason for decedent to have assumed that his employment had been "terminated," and that he should therefore seek other insurance coverage, even putting to one side the statutory notice requirements discussed infra.
[3] We realize that there would have been no pension contributions during these interim periods. Respondent well may wish to provide an option to its members to continue to make payments over brief periods of inactivity such as in the case before us, if such payments are not accrued during the active teaching period. In this case the benefits may be offset by the amount of such appropriate continued payments that would have been made during the summer months up to the date of Hagel's death.
[4] Decedent never taught for the two-month spring semester, but he did teach during the remaining 10 months of the year. During the summer he died he expected to take off the full summer due to his illness. To continue his benefits for the interim period, petitioner would have had to convert the policy to a private plan each year for a two-month period, and then, if the insurer permitted such a short policy, terminate the private plan two months later in order to resume the death benefits available during the next semester when petitioner again taught. The same principle would have applied if there was a week's break between the fall and winter or summer and fall sessions. Even a shorter-term policy would have been required to cover these gaps. While the State Board asserts that a private policy was decedent's remedy, nowhere is there a showing that such a plan in fact exists for coverage over these short periods. The "blue booklet" given each new enrollee in P.E.R.S. does not cover the issue of short interim coverage.
[5] N.J.S.A. 17B:27-24 describes the method of notice:

Written notice presented to the individual, or mailed by the policyholder to the last known address of the individual, or mailed by the insurer to the last known address of the individual as furnished by the policyholder, shall constitute notice for the purposes hereof.